**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ADVANCED EXPORTS, LLC | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SEABROOK WALLCOVERINGS, INC. | : | NO. 18-830 |

## MEMORANDUM OPINION

Savage, J.                                                         January 3, 2019

Advanced Exports, LLC ("Advanced") brought this action against defendant Seabrook Wallcoverings, Inc. ("Seabrook") for wrongful termination of the parties' business relationship.  It claims it suffered damages as a result of Seabrook's unilateral cessation of an exclusive distributorship agreement.  Seabrook moves for summary judgment on all of Advanced's claims and on its counterclaim for breach of contract, arguing there was no contract granting Advanced rights as an exclusive distributor.

After reviewing the record and drawing all inferences in favor of Advanced, we shall grant the motion in part and deny it in part.  Material factual disputes preclude summary judgment on Advanced's claim for breach of contract.  With respect to the remaining causes of action, we shall grant Seabrook's motion.  We shall also deny Seabrook's motion for summary judgment on its counterclaim for breach of contract.

### Factual Background[1]

*Seabrook Wallcoverings Business*

Seabrook manufactured and distributed wallpaper products nationally and

---

[1] These facts are stated from Seabrook's Statement of Undisputed Material Facts ("Def.'s SUMF"), Advanced's Statement of Disputed Facts and Additional Facts ("Pl.'s SDFAF"), and Seabrook's Statement of Additional Facts ("Def.'s SAF"), as well as the accompanying exhibits as attached in support of the summary judgment briefing.  (ECF Nos. 31-2, 32-1, 34-1).  All facts are undisputed unless otherwise noted.  Any facts that Advanced contends are disputed but for which it failed to cite specific, contradictory facts in the record are deemed undisputed.

internationally.[2]  It manufactured collections of individual patterns of wallpaper.[3] Seabrook manufactured each collection for three to five years depending on the popularity of the collection.[4]

Seabrook used distributors to sell its products in the international market. Typically, Seabrook granted exclusive rights to a distributor to sell its products in a defined territory.[5]  Seabrook required each distributor to purchase sample books to market collections.[6]  From 2013 through September 21, 2017, Advanced exclusively distributed Seabrook wallpaper products in the former Soviet Union and other Eastern European countries.[7]  Advanced succeeded Textiles to the World ("Textiles") as Seabrook's distributor in that territory.

*Seabrook's Exclusive Distributors*

In 2010, Textiles became the exclusive distributor of the Seabrook "Classic Elegance" collection in Russia, Ukraine, and Kazakhstan.[8]  Textiles bought 409 sample books of Classic Elegance and 1,896 bolts for $33,180.[9]  Although "standard business procedure" was payment within 30 days, Seabrook agreed to a 60-day window for

---

[2] Seabrook is no longer in business.  In December 2017, Seabrook began to transfer its business to WallQuest, Inc.  Allen Dep. 21:17-27:23 (ECF Nos. 31-4, 32-2).  It finalized the transfer with an agreement between Seabrook and WallQuest on April 30, 2018.  WallQuest and Seabrook Business Transition Agreement (ECF No. 34-9).

[3] Allen Dep. 35:2-6; Allen Aff. ¶ 3 (ECF No. 31-6).

[4] Allen Dep. 35:2-6; Shrayber Dep. 37:16-19 (ECF Nos. 31-7, 32-6); Plessinger May 12, 2015 E-Mail (ECF No. 32-8).

[5] Allen Dep. 35:14-19, 36:19-37:11.

[6] Allen Aff. ¶ 5.

[7] Shrayber Dep. 11:05-07, 114:19-20, 135:22-136:13, 140:19-141:9; Shrayber Decl. ¶ 3 (ECF No. 32-9).

[8] Shrayber Dep. 26:7-32:13.

[9] Plessinger Aff. ¶ 19 (ECF No. 31-9).

payment of Textiles' initial orders.[10]

Seabrook granted exclusive distributorship rights to Textiles for four additional collections.[11]  Textiles purchased over 350 to 400 sample books for each of these four collections.  It also purchased between 960 and 1,944 bolts of each collection, totaling between $15,940 to $29,160, of initial inventory.[12]

Seabrook later memorialized the oral agreements for these five initial collections in letters to Textiles in February 2011.[13]  The letters confirmed that Textiles was Seabrook's "exclusive distributor" in several countries for these five collections, each with a "life of 3 to 4 years."[14]

Between 2011 and 2013, Textiles distributed additional Seabrook collections.[15] There were no written agreements.[16]  For each collection, Seabrook required an initial purchase of books and inventory, the amounts of which varied by collection, but generally in quantities similar to the 2010 and 2011 initial collections.[17]

Seabrook did not require Textiles to meet a sales quota.[18]  Instead, Seabrook monitored performance and "if sales decline[d] the discussion was that [Seabrook] got

---

[10] Shrayber Dep. 37:20-39:15; Allen Dep. 94:02-95:07.

[11] Shrayber Dep. 57:4-65:21.

[12] Plessinger Aff. ¶ 19.

[13] Seabrook Letters (ECF No. 31-8).  These five collections are named Classic Elegance, Chanteclair, Salerno, Garden Diary, and Lucia.

[14] The countries are listed as Russia, Ukraine, Poland, Czech Republic, Romania, Kazakhstan, Uzbekistan, Turkmenistan, Azerbaijan, Armenia, and Georgia.

[15] Shrayber Dep. 91:22-93:11, 105:1-110:16.

[16] *Id.*

[17] *Id.* 75:11-14; Allen Dep. 47:7-49:16; Plessinger Aff. ¶ 19.

[18] Shrayber Dep. 74:17-22, 76:8-18; Allen Dep. 48:21-23.

to do something about this."[19]  Textiles was further required to "service the line," "work the territory," "get books out," and pay for the products.[20]

In 2013, Seabrook stopped dealing with Textiles after hearing rumors that Textiles was having financial difficulty.[21]  James Allen ("Allen"), Seabrook's Vice President and COO at that time, informed Vladimir Shrayber ("Shrayber"), a Textiles' representative, that Seabrook would only do business with him if it was through another company that would agree to pay Textiles' outstanding balance of $500,000.[22]

Shrayber and Tatyana Romanova ("Romanova") formed Advanced.[23]  Shrayber and Textiles agreed that Advanced would take over Textiles' Seabrook business in exchange for Advanced's assuming responsibility to pay Textiles' account balance of approximately $500,000.[24]  Shortly thereafter, Seabrook made Advanced the exclusive distributor for Textiles' unexpired collections and granted Advanced exclusive rights to additional collections.[25]

### New Line 2000

Textiles and Advanced sold Seabrook products—at a "marked [ ] up" price—to New Line 2000 ("New Line"), a separate Russian company, which sold and distributed the products in Russia and Ukraine.[26]  Seabrook had no contract or dealings with New

---

[19] Allen Dep. 51:6-8, 95:8-22.

[20] *Id.* 47:20-49:16, 85:3-86:24, 95:11-22.

[21] *Id.* 42:7-23, 61:1-63:32; Shrayber Dep. 49:4-19.

[22] Allen Dep. 12:21-23, 13:1-10, 63:10-21.

[23] Shrayber Dep. 11:4-5, 114:12-115:2, 117:22-118:9.

[24] *Id.* 116:12-121:3.

[25] *Id.* 49:14-19, 115:10-118:9; Allen Dep. 61:1-4; Plessinger Aff. ¶ 20.

[26] Shrayber Dep. 83:02-85:02; Shrayber Decl. ¶ 15.

Line. Shrayber testified there was "no point for an agreement. We never discuss about any agreement for the distribution in Russia" because it was Advanced's and Textiles' market.[27]

Shrayber stated, in his declaration, that he and Allen had discussed "many times New Line and its role in connection with [Advanced's] marketing and sale" of products.[28] Allen believed New Line was Shrayber's distributor in Russia. He did not know whether New Line was a part of Advanced or a separate entity. He dealt only with Shrayber and Romanova.[29]

*Decline in Sales during 2014 to 2017*

Between 2014 and 2017, Advanced's purchase of sample books, wallpaper, and sales declined.[30] Advanced purchased little or no inventory of some collections. Allen recalled Shrayber "could not afford to buy" stock or books for some collections and the parties "tried to work with the situation for a while . . . ."[31]

Shrayber does not dispute the decline in sales, which he attributes to the downturn in the Russian wallcovering market caused by sanctions imposed after Russia's invasion of Crimea in 2014.[32] The parties agreed to delay book purchases and

---

[27] Shrayber Dep. 79:19-80:21.

[28] Shrayber Decl. ¶ 15.

[29] Allen Dep. 122:14-124:6.

[30] Plessinger Aff. ¶¶ 23-26; Shrayber Decl. ¶ 10. The parties dispute Advanced's exact purchase amounts in non-book sales: Seabrook contends that in 2014, purchases totaled $781,104.80; in 2015, $332,115.74; in 2016, $139,590.14; and in 2017, $51,836.00. Advanced contends that in 2014, purchases totaled $829,869.00; in 2015, $313,437.00; in 2016, $66,972.00, and in 2017, $60,971.00. These differences are not material.

[31] Allen Dep. 135:3-22.

[32] Shrayber Dep. 89:19-90:23.

reduce quantities of stock for at least one collection.[33]

Of the four most recent collections available prior to September 2017, Advanced requested three sample books for each.[34]  Seabrook gave Advanced three sample books for two of the four collections and none for the two other collections.[35]  Seabrook offered to make more books for these collections, provided Advanced placed orders of 250-300 for each.[36]  Advanced did not place the orders.

Allen advised Advanced that it was not "investing in these books at an appropriate level," and that Seabrook's board had instructed him to move forward only with distributors "fully committed for their market."[37]  The board also required that accounts be current.[38]  As a result, Advanced was ultimately unable to obtain exclusivity on the two collections for which Advanced had purchased three sample books each.[39]

Allen discussed these concerns during his deposition:

> [Seabrook was] banking some on a turnaround that we often discussed with Vladimir when we were together.  And we would get promises of payments to clear up things and investment in lines and books.  But we wanted it to work and we went out of our way to try to get it to work.  But our ship started to sink as I told Vladimir in a letter of July 17 that Advanced had put Seabrook out of business in Russia.  We

---

[33] Ashley October 15, 2015 E-Mail (ECF No. 32-44) (offering Seabrook to hold part of the Garden Rose book inventory and reconsidering a lower initial stock offer "based on the market situation" to help Advanced with a more competitive price); Ashley October 22, 2015 E-Mail (ECF No. 32-45) (understanding Advanced could not "take too much risk" during the rough market).

[34] Plessinger March 14, 2017 E-Mail (ECF No. 32-12).  These collections were Retro Living, Montage, Tortuga, and Majorca.

[35] *Id.*

[36] *Id.*

[37] Allen July 21, 2017 E-Mail (ECF No. 31-11).

[38] *Id.*

[39] *Id.*

weren't getting any new lines in the marketplace. And the general rule of thumb 50 percent of the sales you're going to get out of a line is in the first year. So we got two years of almost no books going in the territory . . . .[40]

*Late Payments*

Throughout the relationship, Advanced did not make timely payments for the products purchased, resulting in holds being placed on Advanced's accounts.[41] In April 2017, because Advanced was delinquent in its payments, Seabrook required Advanced to pay 150% of the purchase price of new orders, applying 50% to past due invoices.[42] The next month, to reduce the outstanding balance, Shrayber agreed to make additional weekly payments of $5,000 or $6,000, increasing to $10,000 in July.[43] Shortly thereafter, Seabrook imposed a 200% payment policy on new orders.[44] Advanced ceased making weekly payments.[45] When Seabrook inquired about the lack of payments, Shrayber gave two reasons: "[t]he first is the impossibility of acquiring new collections and the second is the impossibility of buying new rolls, on a double payment basis."[46]

*Seabrook's Termination of Advanced*

By April 2017, Seabrook began searching for a distributor to replace Advanced, sending sample books showcasing the four newest collections to prospective

---

[40] Allen Dep. 137:7-23.

[41] E-Mails regarding holds (ECF No. 31-12).

[42] Allen Dep. 190:16-191:6; Plessinger Dep. 61:10-15 (ECF No. 31-5).

[43] Shrayber Dep. 148:03-149:11, 152:14-154:12.

[44] Allen Dep. 194:19-195:10; Shrayber Dep. 166:13-166:20.

[45] Allen Dep. 194:19-195:10; Shrayber Dep. 166:13-166:20.

[46] Shrayber August 23, 2017 E-Mail (ECF No. 31-14).

distributors.[47]  During discussions with potential distributors, Seabrook acknowledged that Seabrook would fill orders for collections that Advanced placed.[48]  However, Allen specifically stated Seabrook would only fill those orders "as long as [Advanced is] able to comply with the payment policy for past due accounts."[49]

On September 21, 2017, Seabrook ended its relationship with Advanced.[50]  Allen wrote in an email that the payment "plan of action [Shrayber] proposed in May was the last opportunity . . . ."[51]  He observed that the summer had "not gone as well as" hoped and Advanced's account "ha[d] not improved over the last 18 months . . . ."[52]  Allen concluded that "there [wa]s no forward movement."[53]  The Seabrook board instructed him to consider other potential distributors.  After a search, Seabrook selected a distributor to replace Advanced.[54]  Prior to the termination of the relationship, Seabrook had given sample books to other distributors, but it had not sold any products to them.[55]

At the time of termination, Advanced had twelve active lines.[56]  Advanced had

---

[47] Plessinger April 2017 E-Mails (ECF No. 32-25).  These collections were Retro Living, Montage, Tortuga, and Majorca.

[48] *See, e.g.*, Allen July 12, 2017 E-Mail (ECF No. 32-22).

[49] *Id.*

[50] Allen September 21, 2017 E-Mail (ECF No. 31-15).

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] Plessinger Dep. 18:11-19:18, 76:15-80:13.

[56] Plessinger July 20, 2017 E-Mail and Attachment (ECF Nos. 32-11, 32-12).  Advanced submits this price list to show that as of July 2017, it had exclusive rights to a "portfolio" of 22 active collections. *See* Pl.'s SDFAF ¶ 90 (citing attachment to Plessinger July 20, 2017 E-Mail as the "attachment reflecting list of all Excusive Collections in Advanced Exports' portfolio, including 22 active collections"); *see also* Plessinger Dep. 76:15-23.  These collections launched in 2014, 2015, and 2016.  Ten of the lines on this price list have the following comments listed in the "Special Notes" column: "DISC. LOW STOCK Cylinder

purchased books for all, but inventory of only five.[57]

On October 4, 2017, Seabrook demanded that Advanced pay the account balance of $81,568.88.[58] Advanced did not contest the amount due. Instead, its counsel responded that Seabrook had "materially breached its contract with Advanced and otherwise caused Advanced to incur substantial damages . . . ."[59]

Advanced then filed this action. Advanced asserts six causes of action: (I) breach of contract, (II) breach of implied contract, (III) promissory estoppel, (IV) equitable estoppel, (V) fraudulent misrepresentation, and (VI) unjust enrichment. Seabrook counterclaimed for breach of contract and unjust enrichment, seeking payment of outstanding invoices.

## Standard of Review

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

---

turn off" indicating that the collection was discontinued, there was low stock remaining, and the cylinders printing those rolls had been turned off. These ten expired collections are Ainsley, Damask Folio, Dorchester, Galia, Giacomo, Heritage, Leighton, Living with Art, Nefeli, and Olde Francais. The twelve active lines are Avante Garde, Garden Rose, Geometric, Journey, Koi, Lugano, Lux Décor, Metallika, New Hampton, Nouveau Lux, The Avenues, and Willow Creek.

[57] Plessinger Aff. ¶¶ 19-22. These five collections are Avante Garde, Garden Rose, Geometric, The Avenues, and Willow Creek.

[58] Burkett Aff. (ECF No. 31-20); Seabrook October 4, 2017 Letter (ECF No. 31-20).

[59] Cohen & Grigsby November 3, 2017 Letter (ECF No. 31-20)

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. Fed. R. Civ. P. 56(a). Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment. *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## Analysis

### Breach of Contract

*Existence of an Enforceable Contract*

The parties did not have a universal contract granting Advanced exclusive distributorship rights for all wallpaper products in the defined market. Instead, there was a contract for each collection that Advanced had the right to market and sell in the defined territory. Initially, Seabrook issued letters to Textiles authorizing it to distribute specified collections in the territory exclusively. Although Seabrook did not confirm in writing the arrangement after the initial five collections, it continued to deal with Textiles,

and later with Advanced, on the same basis—that is, on a collection-by-collection basis.[60]  Thus, there was a separate oral contract for each collection.

Seabrook contends there was no enforceable contract because the duration was indefinite.  Contrary to Seabrook's characterization, Advanced does not contend it had a perpetual agreement.  Advanced maintains that the term for each collection was the lifecycle of each collection.

We agree with Advanced.  The term of each contract was the lifecycle of the particular collection.  Until Seabrook ceased manufacturing the collection, Advanced had the exclusive right to distribute that collection.  It did not have any exclusive right to future collections.

Advanced contends that as of September 21, 2017, the date Seabrook terminated the relationship, it had exclusive distribution rights to 22 collections. Seabrook had already ceased manufacturing ten of these lines by that date.[61]  Thus, the parties had enforceable contracts as to the following twelve collections: Avante Garde, Garden Rose, Geometric, Journey, Koi, Lugano, Lux Décor, Metallika, New Hampton, Nouveau Lux, The Avenues, and Willow Creek.

There were no contracts covering four new collections released in 2016-17— Retro Living, Montage, Tortuga, and Majorca.[62]  Seabrook gave Advanced the option of

---

[60]  Shrayber Dep. 11:05-07, 114:19-20, 135:22-136:13, 140:19-141:9; Shrayber Decl. ¶ 3; Plessinger Aff. ¶ 20.

[61]  *See supra* n.56; Plessinger July 20, 2017 E-Mail and Attachment.

[62]  Retro Living, Montage, Tortuga, and Majorca are not included on the list that Advanced cites to show what collections it had in its "portfolio."  *See* Pl.'s SDFAF ¶ 90 (citing attachment to Plessinger July 20, 2017 E-Mail as the "attachment reflecting list of all Excusive Collections in Advanced Exports' portfolio, including 22 active collections"); *see also* Plessinger Dep. 76:15-23.  However, Advanced later cites this list in support of its contention that these four collections were, in fact, a part of its portfolio.  *See* Pl.'s SDFAF ¶ 126.

purchasing books at an appropriate level to obtain exclusivity.  Advanced did not do so.  Because Advanced did not commit to purchasing an adequate number of books to show an appropriate investment in these collections, Seabrook refused to grant exclusive rights to these lines.

As we have determined, the parties entered into a separate agreement and formed a separate contract covering each collection Advanced distributed.  Advanced had no exclusive right to distribute future collections.

### Breach of a Duty Imposed by the Contract

When a party's performance is dependent on the other party's, it may treat the other's non-performance as a breach.  *Mallinger v. Mallinger*, 175 A.2d 890, 891 (Pa. Super. Ct. 1961).  In that case, the non-breaching party is relieved of its contractual obligations.  *Apalucci v. Agora Syndicate, Inc.*, 145 F.3d 630, 634 (3d Cir. 1998) (citing *Borough of Nanty-Glo v. Am. Sur. Co. of New York*, 175 A. 536, 537 (Pa. 1934)).

Where both parties materially breach a contract, neither may recover for the other's breach.  *Nikole, Inc. v. Klinger,* 603 A.2d 587, 593 (Pa. Super. Ct. 1992); *Ott v. Buehler Lumber Co.,* 541 A.2d 1143, 1145 (Pa. Super. Ct. 1988).  Accordingly, a party seeking to enforce an agreement or recover damages for a breach must prove that it has performed its obligations under the contract.  Otherwise, it cannot recover.  *Trumbull Corp. v. Boss Constr. Inc.,* 801 A.2d 1289, 1292 (Pa. Commw. Ct. 2002).  Whether a breach is material is an issue of fact unless there is "only one reasonable answer."  *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008).

When Seabrook terminated the relationship, Advanced was distributing twelve collections Seabrook was still manufacturing.  They were Avante Garde, Garden Rose,

Geometric, Journey, Koi, Lugano, Lux Décor, Metallika, New Hampton, Nouveau Lux, The Avenues, and Willow Creek. Seabrook was obligated to continue supplying those products to Advanced as long as Advanced purchased books and inventory adequate to market each collection. Terminating Advanced's rights to distribute active collections still in production was a breach unless Seabrook had cause.

Seabrook contends it terminated the relationship because Advanced was delinquent in its payments and had failed to commit sufficient resources to market the collections. Seabrook argues that Advanced knew that the failure to make timely payment provided a basis for termination because Shrayber was aware Seabrook had terminated Textiles' agreement for nonpayment and that it could—and did—terminate relationships due to financial concerns and nonpayment within the life of the lines.

Whether Seabrook had cause to terminate the contracts for the twelve active collections presents a jury issue. Advanced acknowledges that it had an obligation to pay its bills. It is undisputed that Advanced was frequently late in its payments, causing account holds, delayed shipments, multiple debt payment plans, and Seabrook's concerns.[63] Advanced's failure to pay was a breach. But, whether Seabrook's past practice of allowing extended payment terms implied that such a practice could continue is a jury question.

A jury must also decide whether the decline in Advanced's sales was cause for termination. Advanced was required to purchase books and inventory to obtain exclusivity to a line. Advanced's purchase of books and stocks and sales had declined substantially over the years. In some cases, it purchased no inventory.

---

[63] Allen Dep. 190:16-191:6, 194:19-195:10; Plessinger Dep. 61:10-62:3; Shrayber Dep. 148:3-154:12, 166:13-30; Allen July 21, 2017 E-Mail.

Both Allen and Shrayber testified that the parties decided the initial stocking requirements on a collection-by-collection basis. It is unclear which collections, if any, required little or no inventory.[64] What the parties agreed were the minimum requirements for purchasing books and inventory for each collection is disputed. Thus, we cannot conclude that Advanced's decline in purchases and sales constituted a failure of performance.

*Breach of Covenant of Good Faith and Fair Dealing*

Pennsylvania has adopted Section 205 of the Restatement (Second) of Contracts, which provides: "[e]very contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992); *Stamerro v. Stamerro*, 889 A.2d 1251, 1259 (Pa. Super. Ct. 2005). This obligation extends only to the performance of those duties the party has agreed to assume. *Baker v. Lafayette Coll.*, 504 A.2d 247, 256 (Pa. Super. Ct. 1986), *aff'd*, 532 A.2d 399 (1987).

The duty of good faith and fair dealing "does not create independent substantive rights." *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (citing *Commonwealth v. BASF Corp.*, No. 3127, 2001 WL 1807788, at *12 (Pa. Com. Pl. Ct. Mar. 15, 2001)). It does not give rise to a cause of action separate from a breach of contract claim. Thus, in Pennsylvania, a claim predicated on a breach of the covenant of good faith is "subsumed in a breach of contract claim." *Burton*, 707 F.3d at 432 (quoting *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. Ct. 2008)).

---

[64] Shrayber Dep. 75:11-14; Allen Dep. 47:7-49:16, 132:1-15, 135:3-22.

Seabrook argues that an implied duty of good faith and fair dealing does not create a separate cause of action from a breach of contract claim. Advanced does not plead this as a separate cause of action, but as part of its breach of contract and implied contract claims.[65] Advanced contends that Seabrook breached its covenant of good faith and fair dealing by speaking with other possible distributors and keeping Advanced "in the dark" about its efforts to replace Advanced. According to Advanced, Seabrook, in pursuing these conversations, prevented it from marketing and selling the products from the four newest collections—Retro Living, Montage, Tortuga, and Majorca.

Seabrook did not breach its duty of good faith and fair dealing. The undisputed record shows that Seabrook did not deal with another distributor until *after* it terminated the relationship on September 21, 2017.[66] Seabrook does not deny having discussions with other distributors in anticipation of replacing Advanced as distributor.

There was no contractual obligation, express or implied, barring Seabrook from seeking a new distributor. Nor did Seabrook have an affirmative duty to disclose discussions it was having with prospective new distributors. Hence, we conclude there is no evidence of a breach of the duty of good faith and fair dealing.

### Breach of Implied Contract

Seabrook argues that Advanced's breach of implied contract claim cannot survive due to the existence of an express contract. Advanced concedes that an express agreement precludes a claim based on an implied contract.

---

[65] *See* Compl. ¶¶ 102, 104, 111 (ECF No. 1).

[66] Plessinger Dep. 18:11-19:18, 76:15-80:13.

There can be no implied contract if there is an express contract covering the same subject matter. *Baer v. Chase*, 392 F.3d 609, 616–17 (3d Cir. 2004) (citing *Klebe v. United States*, 263 U.S. 188 (1923)). The two causes of action are mutually exclusive. *Id.* Therefore, because there is a contract cause of action, the breach of an implied contract claim cannot survive.

## Equitable Estoppel

Under Pennsylvania law, there is no independent cause of action for equitable estoppel. It may only be asserted as an affirmative defense or as grounds for preventing the defendant from raising a particular defense. *Carlson v. Arnot–Ogden Mem'l. Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990); *Gilius v. Bd. of Sup'rs of Fairview Twp.*, 552 A.2d 327, 330 (Pa. Commw. Ct. 1988). Thus, Seabrook is entitled to summary judgment on the equitable estoppel cause of action.

## Fraudulent Misrepresentation

In response to Seabrook's argument that Advanced's claim for fraudulent misrepresentation is barred by the gist of the action doctrine, Advanced counters that it is permitted to plead this cause of action in the alternative. It additionally argues that fraud unrelated to the performance of the contract is not precluded by the gist of the action doctrine. In other words, it contends that if Seabrook made fraudulent misrepresentations regarding matters outside the scope of the contracts, Advanced may recover for damages caused by that fraud.

To prevail on a claim for fraudulent misrepresentation, a plaintiff must prove by clear and convincing evidence: (1) a misrepresentation; (2) fraudulently made; (3) an intention by the maker to induce the recipient to act; (4) justifiable reliance on the

misrepresentation; and (5) damages. *Mellon Bank Corp. v. First Union Real Estate Equity and Mortg. Invs.,* 951 F.2d 1399, 1409 (3d Cir. 1991).

Pennsylvania law recognizes a limited cause of action for fraudulent misrepresentation where statements regarding future actions are made with the intent never to perform. *See Brentwater Homes, Inc. v. Weibley,* 369 A.2d 1172, 1175 (Pa. 1977); *Coll. Watercolor Grp., Inc. v. William H. Newbauer, Inc.,* 360 A.2d 200, 206 (Pa. 1976). However, statements made at the time of contracting are not fraudulent if they represent a person's "true state of mind, even though later one changes one's mind." *Coll. Watercolor Grp.*, 360 A.2d at 206.

Advanced claims Seabrook falsely promised exclusivity. The record shows that Seabrook did represent that Advanced had exclusive distributor rights to certain collections. It did not promise that the relationship would last forever. It only granted exclusivity to another distributor after it had terminated its relationship with Advanced.[67] There is nothing in the record from which one could reasonably conclude that when the parties entered into each agreement, Seabrook had no intention to honor it. Therefore, Seabrook is entitled to summary judgment on the false misrepresentation claim.[68]

### Unjust Enrichment

Unjust enrichment, an equitable doctrine sounding in quasi-contract or contract implied in law, is unavailable where the parties' relationship arises from a contract. Breach of contract and unjust enrichment claims cannot coexist. The presence of a contract bars a claim for unjust enrichment. *Wayne Moving & Storage of N.J., Inc. v.*

---

[67] Plessinger Dep. 18:11-19:18, 76:15-80:13.

[68] Because the undisputed evidence shows that Seabrook did not make any fraudulent misrepresentations, we do not address its argument that the cause of action is barred by the gist of the action doctrine.

*Sch. Dist. of Phila.*, 625 F.3d 148, 153 n.1 (3d Cir. 2010) (citation omitted); *Cook v. Gen. Nutrition Corp.*, No. 17-3216, 2018 WL 4440418, at *2 (3d Cir. Sept. 17, 2018); *Benefit Tr. Life Ins. Co. v. Union Nat'l Bank of Pittsburgh*, 776 F.2d 1174, 1177 (3d Cir. 1985). *See also Wilson Area Sch. Dist. v. Skepton*, 586 Pa. 513 (2006) ("[I]t has long been held in this Commonwealth that the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract . . . .") (citations omitted); *Schott v. Westinghouse Elec. Corp.,* 436 Pa. 279 (1969).

Advanced concedes the cause of action for unjust enrichment cannot succeed because the parties had an express contract. It acknowledges that the claim is pleaded as an alternative to the breach of contract claim. Now that we have found that Advanced has a breach of contract claim, Advanced has no claim for unjust enrichment.

With respect to New Line, Advanced argues that even if Seabrook had no contractual relationship with New Line, Advanced could recover as an assignee of New Line under an unjust enrichment claim.

The elements of an unjust enrichment claim are: (1) benefits conferred on the defendant by the plaintiff; (2) appreciation of the benefits by the defendant; and (3) retention of the benefits under circumstances where it would be inequitable for the defendant to retain the benefit without payment of value. *Temple Univ. Hosp., Inc. v. Healthcare Mgmt. Alts., Inc.,* 832 A.2d 501, 507 (Pa. Super. 2003); *Citizens Bank of Pennsylvania v. Reimbursement Techs., Inc.*, 609 F. App'x 88, 95 (3d Cir. 2015).

The undisputed evidence shows that New Line purchased products from Advanced, not Seabrook. New Line's relationship was with Advanced. It had no

relationship with Seabrook. Furthermore, Advanced was free to employ anyone to sell for it. Seabrook had no control over Advanced's choice. Seabrook received no benefits from New Line. Therefore, Seabrook is entitled to summary judgment on count VI.

## Promissory Estoppel

A promissory estoppel cause of action cannot exist where there is an express contract. *See, e.g., Carlson*, 918 F.2d at 416 (Promissory estoppel claims are appropriate only when a party has failed to satisfy the "formal requirements of contract formation . . . and where justice would be served by enforcing a promise."). Thus, for the same reasons Advanced cannot succeed on the implied contract claim, it cannot prevail on its promissory estoppel claim.

Nor can Advanced pursue a promissory estoppel claim as an assignee of New Line. Seabrook made no promises to New Line. There was no relationship between the two. The only promises Seabrook made were to Advanced.

## Third Party Beneficiary Claim – New Line

New Line is not a party to this action. As New Line's assignee, Advanced brings claims based upon its contention that New Line is a third party beneficiary to the parties' contracts.

To recover as a third party beneficiary, one must satisfy a two-part test. First, the parties to the contract must express their intention to benefit the third party in the contract, unless the circumstances are "so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties." *Scarpitti v. Weborg*, 609 A.2d 147, 150 (Pa. 1992) (citing *Guy v. Liederbach*, 459 A.2d 744, 751 (Pa. 1983) and RESTATEMENT (SECOND) OF CONTRACTS (1979)). Second, "the

performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance." *Id.*

The first part of the test is a standing requirement. *Scarpitti*, 609 A.2d 149-50. Unless the parties expressly intended to treat the third party as a beneficiary, the third party is no more than an incidental beneficiary. In that case, the third party has no standing to assert a contract claim.

The complaint describes New Line as an entity that Advanced employed to help with its marketing, distribution, and sales efforts.[69] Advanced claims it represented New Line in dealing with Seabrook.[70] Although the complaint alleges that Seabrook "was informed and aware" of New Line's involvement, it does not allege, explicitly or inferentially, that Seabrook intended New Line to be a third party beneficiary when the parties' contracts were formed.

There are no contract claims stated for New Line.[71] Instead, only the promissory estoppel and unjust enrichment claims mention the "Effectuating Parties," which encompasses New Line and another Russian individual.[72] The complaint also asserts damages suffered only by Advanced.[73]

---

[69] Compl. ¶ 22.

[70] *Id.* ¶ 23.

[71] *See id.* ¶¶ 98-113.

[72] *Id.* ¶¶ 22, 116-17, 127-28.

[73] *See id.* ¶¶ 106, 113, 119, 130, 139, 144. Advanced alleges only in the opposition brief and Shrayber's declaration that New Line has suffered damages. As New Line's assignee, Advanced seeks to recover for New Line's alleged damages. *See* Pl.'s Opp'n Mot. Summ. J. 27-28; Shrayber Decl. ¶¶ 16-17, 23-25.

Because Advanced has failed to assert contract claims on behalf of New Line as a third party beneficiary, it cannot do so now. *See, e.g., Picture Lake Campground v. Holiday Inns, Inc.*, 497 F. Supp. 858, 862 (E.D. Va. 1980); *Berel Co. v. Sencit F/G McKinley Assocs.*, 710 F. Supp. 530, 534 (D.N.J. 1989); *Hauer v. Bankers Tr. New York Corp.*, 425 F. Supp. 796, 800 (E.D. Wisc. 1977); *Angleton v. Pierce*, 574 F. Supp. 719, 735 (D.N.J. 1983), *aff'd*, 734 F.2d 3 (3d Cir. 1984) ("The complaint does not allege that the plaintiffs are third-party beneficiaries of the regulatory agreement; arguably, this omission alone should lead to dismissal of the relevant portions of the complaint for failure to state a claim."). Even if it had, Advanced has not shown that New Line was a third party beneficiary.

Despite its failure to plead a third party beneficiary claim, Advanced argues that the parties intended New Line to be a third party beneficiary. It cites its relationship with New Line, New Line's role in distributing Seabrook's products, and that Advanced (and Textiles before it) had a contractual relationship with New Line that was dependent on Seabrook's exclusivity agreement. According to Advanced, New Line was instrumental and integral in Advanced's marketing, sale, and distribution of the Seabrook products.[74]

New Line was not a party to any agreement between Seabrook and Advanced. Advanced and Seabrook did not affirmatively express their intention that New Line was an intended beneficiary at the time they formed the contracts. Shrayber described the contractual terms as "simple," with Advanced needing to buy "X amounts of book, X amount of initial stock" in exchange for exclusivity.[75]

---

[74] Pl.'s Opp'n Mot. Summ. J. 5.

[75] Shrayber Dep. 27:18-32:8.

Advanced makes conclusory assertions that Seabrook knew of New Line's role. It does not matter if it did. It did not, by words or actions, acknowledge New Line's role as a third party beneficiary. Nor has Advanced produced any evidence that there was a contractual relationship between Seabrook and New Line.

There are no "compelling circumstances" deeming it appropriate to recognize New Line as a third party beneficiary. Advanced had a contractual relationship with New Line to facilitate Advanced's marketing of Seabrook's products. The terms of the Advanced-New Line relationship were not dictated by Seabrook. Seabrook intended its products to be sold and marketed by Advanced. How Advanced did that was dictated by Advanced, not Seabrook.

We conclude New Line was not a third party beneficiary of the parties' contract.[76] Consequently, New Line has no contract claim against Seabrook that Advanced can assert as New Line's assignee.

## Damages

Seabrook argues that the court lacks subject matter jurisdiction because Advanced has no damages and consequently it cannot meet the amount in controversy requirement. It contends Advanced sold its remaining inventory to New Line. Advanced responds that its damages are at least $2,275,901, of which $1,465,233 were suffered by Advanced directly and $810,667 by New Line.[77]

---

[76] Because New Line has no standing to enforce the contract, we need not address the second prong under *Scarpetti*. 609 A. 2d at 149-50.

[77] Pl.'s Opp'n Mot. Summ. J. 27-28. Advanced itemizes these costs as follows: 17,713 books totaling $1,156,962; 23,090 rolls totaling $462,609; $279,235 for costs of and expenses in trade show and promotional efforts; $266,650 for costs of and expenses in marketing and promotional efforts; $120,000 in warehouse rent ($2,500 a month); and $30,445 in "additional expenses incurred as a result of Seabrook's . . . termination." Shrayber Decl. ¶¶ 16-17.

If the jury determines that Seabrook breached the contracts with respect to any of the twelve collections, Advanced may recover, assuming it can prove, its damages on the collection for the cost of books and inventory it had purchased, remaining inventory that it could not sell, and the lost profits for the remainder of the collection's lifecycle. Advanced cannot recover damages, if any, sustained by New Line.

Although Advanced claims its damages exceed one million dollars even without New Line's claimed damages, the evidence is disputed. However, it is apparent that Advanced's alleged damages exceed $75,000. Hence, the amount in controversy requirement is satisfied.

## Seabrook's Counterclaim

Seabrook argues that it is entitled to judgment on its counterclaim for $81,568.88. Seabrook contends that each invoice is a separate contract for the sale of goods governed by the Uniform Commercial Code ("UCC"). Advanced counters that the UCC is inapplicable. Instead, it contends that the invoices relate to the parties' overarching distributorship agreement, and it would be inappropriate to enter summary judgment here without resolving the damages owed to it by Seabrook from its own breach of contract claim.

Section 2-717 of the UCC provides "buyers on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract." However, as the clear language states, it only allows an offset of damages arising from the same contract. Damages on one contract cannot be deducted from damages on another because they are separate contracts.

Advanced concedes that it "purchased" and Seabrook "delivered" products.[78] Advanced took delivery of the goods and did not reject them. Under UCC section 2-607(1), "the buyer must pay at the contract rate for any goods accepted." Thus, Advanced had an obligation to pay the contract price as the invoices became due.

The invoices are separate contracts from the distributorship agreement. *See Carlisle Corp. v. Uresco Constr. Materials, Inc.*, 823 F. Supp. 271, 272-74 (M.D. Pa. 1993) (holding invoices separate from distributorship agreement because the agreement did not provide a specific framework for shipment or payment; instead, it "broadly set forth" the parties' terms whereas each purchase and invoice created a right to payment); *see also Hellendall Distribs., Inc. v. S.B. Thomas, Inc.*, 559 F. Supp. 573, 574 (E.D. Pa. 1983); *Travenol Labs., Inc. v. Zotal, Ltd.*, 394 Mass. 95, 97-98; (1985); *C.R. Bard, Inc. v. Med. Elecs., Corp.*, 529 F. Supp. 1382, 1387 (D. Mass. 1982); *Rebaque v. Forsythe Racing, Inc.*, 134 Ill. App. 3d 778, 781 (1985).

Advanced asserts breaches that relate to Seabrook's termination of its distributorship agreement as to the active collections. But, it has not alleged—nor could it—that Seabrook has acted improperly in the actual sale or delivery of the physical goods. Instead, Advanced contends Seabrook is not entitled to recover any past due balance because it breached the parties' contracts. Because invoices are separate contracts, Advanced's alleged damages for breach of the distributorship contracts cannot be offset against the amount it owes Seabrook under the invoices. *See, e.g., Bard*, 529 F.Supp. at 1387 (breaches asserted by a buyer relating to the termination of a distributorship agreement does not evidence that the seller acted improperly regarding

---

[78] Answer to Countercl. ¶¶ 151-53 (ECF No. 17); Pl.'s Opp'n Mot. Summ. J. 30.

the actual sale or delivery of goods; buyer thus may not delay payment for goods accepted by asserting a breach of contract).

Seabrook claims the amount owed stated on its invoices is undisputed. According to Seabrook, the final demand letter attached the latest account statement.[79] Advanced admits that it had an account balance, but Advanced claims that it never reviewed invoices or statements issued by Seabrook to verify if they were correct.[80] Shrayber does not directly dispute the final invoice amount. Instead, he contends Advanced does not owe the balance because Seabrook breached the distributorship agreements.[81]

Advanced also makes inconsistent statements about whether it received the latest invoices and account statement. In its answer to Seabrook's counterclaim, while denying that the invoices submitted by Seabrook reflect actual "invoices," Advanced concedes that Seabrook provided and Advanced received the demand letter and final account statement.[82] However, in its opposition, Advanced denies receiving "the invoices establishing Seabrook's counterclaim amount" and claims it only received the one-page demand letter.[83]

We conclude that because the distributor agreements are separate contracts from the invoices, Advanced may not offset its damages for breach of contract against Seabrook's counterclaim for the amount due on the invoices. However, we cannot

---

[79] Burkett Aff. ¶ 2; Seabrook October 4, 2017 Letter.

[80] Pl.'s SDFAF ¶ 96.

[81] *Id.* ¶¶ 68-69; Shrayber Dep. 175:7-177:24.

[82] Answer to Countercl. ¶ 152.

[83] Pl.'s SDFAF ¶¶ 68-69, 96.

determine the amount that is due on Seabrook's counterclaim.  Therefore, we cannot grant summary judgment on Seabrook's counterclaim.

## Conclusion

There are genuine issues of disputed material facts precluding summary judgment on Advanced's breach of contract claim and Seabrook's counterclaim.  As to Advanced's remaining causes of action on counts II, III, IV, V, and VI, Seabrook is entitled to judgment as a matter of law.  Thus, we shall grant in part and deny in part Seabrook's motion for summary judgment and deny Seabrook's motion for summary judgment on the counterclaim.