# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ADVANCED EXPORTS, LLC** | : | **CIVIL ACTION** |
| v. | : | |
| **SEABROOK WALLCOVERINGS, INC.** | : | **NO. 18-830** |

## MEMORANDUM OPINION

**Savage, J.**                                                                                          **February 7, 2019**

Plaintiff Advanced Exports, LLC ("Advanced") moves for reconsideration of our January 3, 2019 ruling partially granting defendant Seabrook Wallcoverings, Inc.'s ("Seabrook") motion for summary judgment.[1] It contends we erred in determining the duration of its exclusive rights to distribute Seabrook's wallpaper collections and the number of collections within the scope of exclusivity at the time the relationship ended.

Because there was no error, we shall deny Advanced's motion.

## Background[2]

Seabrook manufactured and distributed wallpaper collections nationally and internationally. Seabrook granted Advanced exclusive distribution rights to market and sell a number of collections in certain countries. The parties had a separate agreement for each collection that Advanced distributed for the duration of the manufacturing lifecycle of each particular collection, which was three to five years depending on the popularity of the collection. Hence, until Seabrook ceased manufacturing the collection, Advanced had the exclusive right to distribute that collection.

---

[1] Mem. Op. (ECF No. 35).

[2] In the January 3, 2019 Memorandum Opinion, we recited the factual background in more detail. Only those facts relevant to the instant motion are repeated.

Advanced contends that as of September 21, 2017, the date Seabrook terminated the relationship, it had exclusive distribution rights to 22 collections.[3] But, we found that only twelve of the lines on the inventory list were being manufactured. The other lines were no longer manufactured as of that date.[4]

Seabrook was obligated to continue supplying those twelve lines to Advanced as long as Advanced had purchased the initial books and inventory adequate to market each active collection unless Seabrook had cause to terminate. Whether Seabrook had cause to end the agreements is a jury question.

Advanced seeks reconsideration of our determination that only twelve active lines remained.[5] Advanced argues that the duration of the contract extended beyond the manufacturing lifecycle of each collection. It contends it lasted until Seabrook had no inventory to sell. Advanced contends that we committed clear error because it remains a jury question as to which lines the parties had enforceable contracts as of September 21, 2017.

**Standard of Review**

A party may move to alter or amend a judgment pursuant to Rule 59(e) on any of three grounds: (1) an intervening change in the law; (2) the availability of new evidence; or (3) the need to correct a clear error of law or fact, or to prevent manifest injustice.

---

[3] Advanced contends that it mistakenly stated it had rights to 22 collections when the correct number was 27. Nonetheless, the number of active lines remains the same. *See infra* n.4.

[4] *See* Plessinger July 20, 2017 E-Mail and Attachment (ECF Nos. 32-11, 32-12). All but twelve of these collections have the following comments listed in the "Special Notes" column: "DISC. LOW STOCK Cylinder turn off" indicating that the collection was discontinued, there was low stock remaining, and the cylinders printing those rolls had been turned off.

[5] Pl.'s Mot. for Recons. (ECF No. 37).

*Schumann v. Astrazeneca Pharm., L.P.*, 769 F.3d 837, 848 (3d Cir. 2014) (citation omitted); *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir. 2011) (citation omitted).[6]

"The scope of a motion for reconsideration . . . is extremely limited." *Blystone*, 664 F.3d at 415. A motion for reconsideration is not an "opportunity to relitigate the case; rather, [it] may be used only to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* (internal citations omitted). As a rule, a court "should be loathe" to revisit its prior decision absent "extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Cold Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (citing *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)); *see also Pub. Interest Research Grp. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116-17 (3d Cir. 1997).

A court may clarify or correct an earlier, ambiguous ruling and may reconsider an issue if a prior ruling, "even if unambiguous, might lead to an unjust result." *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009) (internal citations omitted). However, if the "trial judge decides to change or explain an earlier ruling," he must state the reasons on the record and "take appropriate steps so that the parties are not prejudiced by reliance on the prior ruling." *Id.* (internal citations omitted).

Advanced cannot rely upon arguments that were addressed and rejected. In short, a Rule 59(e) motion may not be used to relitigate the case. *Blystone*, 664 F.3d at 415 (citing *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010)); *see also Cont'l Cas. Co. v. Diversified Indus., Inc.*, 884 F.Supp. 937, 943

---

[6] Advanced's motion for reconsideration does not cite the procedural rule on which it relies. Because Advanced argues that our determination in deciding the motion for summary judgment was in error and asks that we alter that determination, we shall construe the motion as one pursuant to Federal Rule of Civil Procedure 59(e).

3

(E.D. Pa. 1995) ("Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly.") (citation omitted).

**Analysis**

In its motion for reconsideration, Advanced argues that we erred in finding that the lifecycle of each collection was its manufacturing life and that the parties had enforceable contracts as to only twelve collections.[7] It argues that the record evidences that the "lifecycle of a given collection was measured by the length of time it was manufactured by Seabrook (i.e., typically four to five years), as well as the time it takes Seabrook to sell its remaining inventory of products in that collection once the manufacturing period stops."[8]

In support of its contention, Advanced relies on the testimony of James Allen, Brenda Plessinger, and Vladimir Shrayber.[9] However, the testimony does not support Advanced's position.

Allen testified that when Seabrook stopped "print[ing the] wallcovering . . . the line is gone . . . ."[10] When asked what happened to inventory after printing ceases, Allen answered that "[o]nce they quit printing that is it." If Seabrook has leftover inventory, Seabrook "maintain[s] it."[11] Plessinger's cited testimony confirms that if there is leftover inventory in Seabrook's possession that Seabrook sells off over time, Seabrook's distributors may continue to place orders for those collections, but they are

---

[7] Pl.'s Mot. for Recons. at 2.

[8] *Id.* at 3-4 (citing Advanced's Statement of Disputed Facts and Additional Facts ¶¶ 37, 74 ("Pl.'s SDFAF") (ECF No. 32-1)).

[9] *Id.*

[10] Allen Dep. 182:19-183:16 (ECF No. 32-2).

[11] *Id.*

4

limited to what, if any, stock actually remains.[12]  In other words, Advanced was free to sell and to distribute what inventory it had left after the manufacturing lifecycle ended.

Shrayber's testimony Advanced relies upon contradicts itself.  On one hand, in his declaration, he states that the product's lifecycle included the "post-manufacturing period for so long as Seabrook retained that collection in its inventory."[13]  Advanced had this right so long as it continued to market the collection and pay for the products in accordance with the parties' contractual agreement.[14]  On the other hand, he testified that when the parties first entered into their agreement, the "agreement was simple.  We need to buy X amounts of books, X amount of initial stock," in exchange for exclusivity "for whole period of life of this collection between . . . four and five years."[15]  Shrayber again described a collection's "life" as "four years" and reiterates that his agreement with Allen was that Advanced could "buy as long as this collection is during four, five years."[16]  He states in another excerpt that Seabrook produced collections for approximately "four or five years," which is the period of exclusivity, for "whole life of collection."[17]

Shrayber gave confusing testimony when he described a more flexible "life" of a collection.  His understanding was that Advanced had rights to any collection that was purchased from Seabrook "for whole life collection, *not whole life manufacturing collection, not for whole life when company, Seabrook, carry stock*, but whole life of

---

[12] Plessinger Dep. 74:5-:15 (ECF No. 32-4).

[13] Shrayber Decl. ¶ 11 (ECF No. 32-9).

[14] *Id.*

[15] Shrayber Dep. 31:19-:23 (ECF No. 32-6).

[16] *Id.* at 37:16-:19.

[17] *Id.* at 66:3-67:7.

5

collection. Nobody said to me, this bolt of wallpaper will die in five years."[18] When asked again how long the term was, Shrayber answered "[f]orever. . . . for as long as product will be available anywhere, everywhere."[19] Advanced argues this was Shrayber's clarification that instead of the lifecycle being the manufacturing lifecycle, the life included the time after manufacture when inventory remained. This is clearly contradicted by the plain words used immediately prior when Shrayber refutes that the lifecycle means when "Seabrook[ ] carr[ies] stock."

At one point, Advanced contends that Seabrook granted it the exclusive right to distribute collections through the exclusive territory for the duration of the collection's "lifecycle (i.e., typically four years)."[20] It argues that Allen "acknowledged that the term of the parties' agreement with respect to each of the exclusive collections—i.e., Seabrook's obligation to continue selling each of the Exclusive Collections—was the length of the *manufacturing* lifecycle of each such collection" with "Shrayber's testimony [ ] in accord."[21] Allen's cited testimony shows that when Seabrook had leftover inventory of products in a collection, a distributor would "continue to have the right to sell that product."[22] This is in accord with Plessinger's earlier testimony that a distributor could purchase and sell any leftover inventory remaining after manufacturing ended.[23]

---

[18] *Id.* at 53:6-54:1.

[19] *Id.* at 54:3-:10.

[20] Pl.'s SDFAF ¶ 19.

[21] *Id.* ¶ 29 (emphasis added) (citing Allen Dep. 87:13-89:15 (a distributor's "right to a distribute a given collection on an exclusive basis lasted only so long as Seabrook continued to *manufacture* that collection," and that collections are not "support[ed] beyond the life"—typically "between three or four years.") (emphasis added)).

[22] Allen Dep. 89:16-:20.

[23] *See supra* n.12.

In opposing Seabrook's motion for summary judgment, Advanced also clearly referenced the manufacturing lifecycle. Advanced states that its predecessor's original essential terms (which Advanced inherited) included exclusive rights to a collection "for the duration of the lifecycle (typically 4-5 years)" in exchange for the purchase of books and stocks to market the collections.[24] The parties continually referenced the lifecycle as the time period of manufacture.[25] Advanced even concedes that the manufacturing time period discrepancy between Allen's testimony of three to four years versus Shrayber's testimony of four to five years is an unimportant distinction without a difference. Instead, what mattered was that the term was the manufacturing lifecycle—"*however long that lifecycle turned out to be.*"[26]

Advanced's complaint makes no mention of contractual rights to any of Seabrook's post-manufactured stock and instead refers to a collection's lifecycle as the time period of manufacture.[27] Advanced alleges in the complaint that this was the time period of exclusivity.[28] The breach of contract count specifically alleges that Seabrook

---

[24] Pl.'s Opp'n to Mot. Summ. J. at 2 (ECF No. 32) (citing Pl.'s SDFAF ¶ 72).

[25] *See id.* at 3. Advanced argues the parties had an enforceable agreement with "a specified term," with the exclusive right to distribute lasting "for the duration of that collection's product lifecycle (i.e., typically four to five years)" and reiterates this when it argues that "Seabrook committed itself to continue selling each of the Exclusive Collections for the duration of their respective product lifecycles – i.e., between four and five years."

[26] *Id.* at n.2 (emphasis added).

[27] *See* Compl. ¶¶ 2 ("Advanced Exports agreed to become the exclusive distributor of Seabrook-branded products" in exchange for exclusive distribution rights to "any Seabrook-branded product within Advanced Exports' portfolio for the duration of that *product's manufacturing lifecycle* (i.e., between four and five years).") (emphasis added); 17 ("Seabrook's collections are not permanent: Each collection has a *limited manufacturing lifecycle* – typically four to five years.") (emphasis added).

[28] Compl. ¶¶ 30 (Allen promised Shrayber that Seabrook would sell collections solely to Shrayber for its "entire lifecycle – i.e., 5 years."); 35 (Seabrook would continue selling each collection for the "duration of their respective lifecycles for each collection."); 39 (Seabrook would sell all such collections solely to Shrayber for the "duration of their respective lifecycles (i.e., at least four to five years).").

refused to sell Advanced "products for the duration of those products *manufacturing* lifecycles . . . ."[29]

Seabrook notes that we have already considered and rejected the contention that the lifecycle extended past manufacturing to include the undefined time where there may be leftover inventory in Seabrook's possession and management.[30] There is no support in the record that Advanced's exclusive right covered the post-manufacture time period. Nor is there any support that the leftover inventory was an explicit term of the parties' distribution contracts. Instead, the record shows that the "life" of a collection was the manufacturing life.

Nevertheless, the leftover inventory, if any, presented additional avenues of sales for Advanced. If Seabrook had leftover inventory after manufacturing ended, Advanced and other distributors in other territories could market and sell it in their respective territories.[31]

Advanced's new argument contradicts its contention that its breach of contract claim does not fail for lack of a definite duration of each contract. If, as Advanced now seems to argue, each contract lasted as long as Seabrook had inventory of the line remaining, the contract term would have no end. In other words, Advanced would have exclusive rights to each collection in perpetuity if certain lines became outdated and less popular, resulting in voluminous leftover inventory with no foreseeable future sales. *See*

---

[29] Compl. ¶¶ 100, 103(c) (emphasis added).

[30] Def.'s Opp'n to Mot. for Recons. at 3 (ECF No. 38).

[31] The exhibit attached in support of Advanced's motion for reconsideration supports our conclusion. The inventory evidences that the majority of the lines listed only had stock available, was unavailable for reprint, and further notes that delivery was subject to availability of the product within the *manufacturer's* warehouse (i.e., not within the possession or control of any distributor). Mot. for Recons., Ex. 1 (ECF No. 37-2).

*Slonaker v. P.G. Publ'g Co.*, 338 Pa. 292 (1940) ("The general rule is that when a contract provides that one party shall render service to another . . . or shall have exclusive sales rights within a certain territory, but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either party at will."); *see also King of Prussia Equip. Corp. v. Power Curbers, Inc.*, 287 F. Supp. 2d 594, 598 (E.D. Pa. 2003), *aff'd*, 117 F. App'x 173 (3d Cir. 2004) (refusing to bind parties to an "indefinite agreement," because there was no "precise and unmistakable" language for such); *Roberts Tech. Grp., Inc. v. Curwood, Inc.*, No. 14-5677, 2015 WL 5584498, at *5 (E.D. Pa. 2015) (Pennsylvania law disfavors contracts with perpetual duration without "clear and unequivocal terms" as it would be unreasonable for parties to intend for contracts to last "forever" absent such terms).

It appears Advanced misunderstands our summary judgment ruling. To be clear, Advanced was not precluded from continuing to sell Seabrook's collections after the manufacturing cycles ended. It could sell stock it had already purchased from Seabrook and stock Seabrook was willing to sell it from Seabrook's remaining inventory. Of course, if a jury finds that Seabrook had cause to terminate the relationship, Advanced had no further exclusivity rights.

## Conclusion

Advanced has not demonstrated any grounds to reconsider our ruling. Thus, we shall deny its motion.